*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, DEPARTMENT OF TRANSPORTATION AND PUBLIC FACILITIES, | ) ) ) ) | Supreme Court No. S-17048 |
| | ) | Superior Court No. 3AN-17-04261 CI |
| Petitioner, | ) ) | O P I N I O N |
| v. | ) ) | No. 7447 – May 1, 2020 |
| OSBORNE CONSTRUCTION COMPANY, | ) ) ) | |
| Respondent. | ) ) ) | |

Petition for Review from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Jeffrey P. Stark, Chief Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Petitioner. Michael E. Kreger and Sarah C. Gillstrom, Perkins Coie, LLP, Anchorage, for Respondent.

Before: Winfree, Stowers, Maassen, and Carney, Justices. [Bolger, Chief Justice, not participating.]

CARNEY, Justice.

## I.    INTRODUCTION

A state agency appeals a superior court decision reversing the agency's decision in an administrative appeal. The agency denied a contractor's claim for

additional compensation because the claim was filed outside the filing period allowed by the contract. After applying our independent judgment to interpret the contract, we agree with the agency that the contractor failed to file its claim within the period allowed. We therefore reverse the superior court's decision and reinstate the agency's.

## II.   FACTS AND PROCEEDINGS

### A.   Facts

In August 2013 the Alaska Department of Transportation and Public Facilities (DOT) entered into a contract with Osborne Construction Company to upgrade the Aircraft Rescue and Fire Fighting building at the Fairbanks International Airport to withstand damage in the event of an earthquake. The contract listed a series of upgrades to be completed. In addition to renovations to the building, the contract required "soil structure improvements" to the building site.

The purpose of the soil structure improvements was to alleviate the risk of liquefaction.[1] This was to be accomplished by compaction grouting, a process in which grout is injected into the ground at regularly spaced intervals to increase soil density.[2] The contract provided specifications for the material to be used in the grouting process; Osborne was responsible for obtaining conforming materials.

---

[1]     Soil liquefaction is a phenomenon in which the strength of a soil is reduced by strong ground shaking. This reduces the ability of the soil to support foundations for buildings. U.S. GEOLOGICAL SURVEY, *What is liquefaction?*, https://www.usgs.gov/faqs/what-liquefaction? (last visited Mar. 11, 2020).

[2]     The grout was required to be a combination of cement, "fine aggregate," and water. The aggregate had to be a particular type of  sand: "naturally occurring, clean, round to subrounded, hard, water-worn siliceous material, free of flat or elongated pieces, . . . or . . .foreign matter, and graded within the limits" set by the contract.

The contract also established procedures for changes to the contract (Article 9), resolution of disagreements (Article 15), and requests for additional compensation or time (Article 15). Article 15 set out a series of deadlines by which the contractor had to notify DOT of any claim for additional compensation.

Osborne hired AVAR[3] in October 2013 as a subcontractor to perform the compaction grouting work; DOT accepted AVAR as a subcontractor in November 2013. AVAR then prepared and submitted a compaction grouting proposal to Osborne in December; Osborne forwarded it to DOT in January 2014. In March Osborne submitted a revised plan to DOT, identifying 437 grout injection points, the material and equipment to be used, and the installer's qualifications. DOT accepted the proposal in late March.

AVAR began the grouting work on June 30, 2014, but encountered difficulties. The sand AVAR intended to use was no longer available from the local supplier identified in its bid, and AVAR proposed an alternative source of sand to Osborne. Osborne provided an analysis of the sand to DOT's engineers, Shannon & Wilson, and requested they approve its use. Shannon & Wilson recommended rejecting the sand as non-compliant with the contract terms. AVAR then located another alternative from an Anchorage-based source; Shannon & Wilson again recommended its rejection.

AVAR located and began to import sand from a new source in California in late July. But even after obtaining better quality sand, AVAR was delayed again by equipment issues. AVAR was finally able to begin compaction grouting with the imported sand in mid-August.

---

[3] In its proposal to Osborne, AVAR identified itself as "GMI, A Division of AVAR." This entity is referred to as GMI throughout the record, but because the parties use "AVAR" in their briefs, we do as well.

By September 7, 2014, AVAR had successfully completed 154 injection points in the exterior area surrounding the building. Grouting within the building's interior began the next day. AVAR immediately encountered issues with grouting inside the building, and hired a consulting firm, Langan Treadwell Rollo (Langan), to study the soil underneath the building and determine the source of the problem.

Langan prepared a report for AVAR and made several recommendations to alleviate the difficulty while still achieving the desired level of soil improvement. The Langan report attributed the difficulty of injection to nearby grouting injection points outside the building, which made the soil beneath the building more dense. AVAR provided the Langan report to Osborne on September 24.

The next day Osborne petitioned DOT for a modification of the grouting plans, attaching a copy of the Langan report. On October 9 DOT tentatively approved Osborne's request to increase the spacing between injection points, but withheld final approval until after Shannon & Wilson was able to observe and confirm that the modification was acceptable. DOT ultimately approved Osborne's request to increase the spacing between injection points but did not permit any other changes.

AVAR completed the injection grouting work the next day, on October 10. On October 13 Osborne transmitted to DOT a letter from AVAR, dated October 3 and addressed to Osborne, which was entitled "NOTICE OF CHANGE IN GROUND CONDITIONS." In the letter AVAR stated that it had incurred increased costs due to soil conditions inside the building that were "dramatically different" than conditions outside the building. The letter also promised to provide Osborne with an analysis of the additional costs and the results of bore studies analyzing the soil conditions.

On February 2, 2015, AVAR sent a letter with a claim for additional compensation to Osborne. The letter was addressed to both Osborne and DOT's Anchorage office. In the letter AVAR stated two bases for its claim for increased

compensation: (1) differing site conditions and (2) a lack of locally available sand that met the contractual specifications.

On May 11, 2016, Osborne submitted a claim to DOT seeking additional compensation for the compaction grouting work, incorporating AVAR's February 2015 letter to Osborne. DOT notified Osborne on July 13 that its claim was not valid because it did not comply with certification requirements.[4] DOT requested that Osborne remedy the certification issue and re-submit the claim, which Osborne did on September 20.

## B. Proceedings

The DOT contracting officer issued a written decision on October 28, 2016, denying Osborne's May 11, 2016 claim for additional compensation. The contracting officer first explained that the claim did not comply with Article 15 of the contract. Article 15.1.5 states:

> If the claim or dispute is not resolved by the DEPARTMENT, then the CONTRACTOR shall submit a written Claim to the Contracting Officer within 90 days after the CONTRACTOR becomes aware of the basis of the claim or should have known the basis of the claim, whichever is earlier.

The contracting officer concluded that Article 15.1.5 required Osborne to file a written claim with DOT within 90 days of becoming aware of the basis of the claim. The contracting officer also concluded that, under the contract, failure to file a claim within

---

[4] In its claim, Osborne stated that it was "not the real party in interest," and "must accept and rely on the certification of [AVAR] at face value." Because DOT was not in privity of contract with AVAR, DOT determined that this certification was "not relevant to the contract." DOT required Osborne to certify the claim itself. *See* AS 36.30.620(a) (requiring a contractor "certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of the contractor's knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the state is liable").

the specified time resulted in the waiver of a contractor's right to claim.

To determine whether Osborne filed its claim within the prescribed period, the contracting officer first calculated the latest date on which Osborne could have properly submitted its claim. The contracting officer found the latest date by which Osborne should have known the basis of the claim for additional compensation was the date of completion of the grouting work — October 10, 2014 — and that the claim should have been filed by January 8, 2015.

The contracting officer also considered two possible alternative dates. First the contracting officer posited that even if Osborne could argue that the date that AVAR submitted its claim to Osborne was the date upon which Osborne became aware of the basis for the claim, Osborne still failed to file its claim within the required period. Because AVAR submitted its claim to Osborne on February 2, 2015, Osborne would have been required to file its claim by May 6, 2015. Finally, the contracting officer calculated that even using the date of the project's substantial completion — March 24, 2015 — as the latest possible date that Osborne could argue it became aware of the basis of its claim, the deadline for a timely claim would have been June 22, 2015.

The contracting officer concluded that because Osborne's claim for additional compensation was initially submitted on May 11, 2016, and the corrected claim on September 20, 2016, "Osborne at best was just under a year late and at worst over a year and four months late in filing its claim." Because the contract required a contractor to "submit in writing a claim to the Contracting Officer within 90 days after the Contractor becomes aware of the basis of the claim or should have known the basis of the claim, whichever is earlier," the contracting officer found that Osborne had failed to file its claim within the contractual time period.

The contracting officer then turned to the requirements in the state procurement code, AS 36.30.005-.995, for filing a contract claim.[5]  Noting that AS 36.30.620(a) requires a claim to be "filed within 90 days after the contractor becomes aware of the basis of the claim or should have known the basis of the claim, whichever is earlier," the contracting officer concluded Osborne "did not file its claim by the date required" by statute.  After examining both Osborne's contract and the procurement code, and finding that Osborne's claim failed to meet the deadline established by either of them, the contracting officer ruled that Osborne's claim was barred by statute as well as by the contract.

Osborne appealed the contracting officer's decision to the DOT Commissioner.  On December 16, 2016, the Commissioner "adopt[ed] the [contracting officer's decision] as the final administrative decision without a hearing."[6]  The Commissioner's decision discussed the requirements of submitting a claim for additional compensation and the untimeliness of both the notice of the claim and the claim itself.

The Commissioner determined that the contracting officer's decision was sound because the contract language was clear that a contractor's failure to assert a claim within 90 days would result in the waiver of its claim.  And while the Commissioner adopted the contracting officer's decision on this ground, he also addressed and rejected Osborne's arguments that the contract's terms were "aspirational" rather than "mandatory," and that DOT's actual notice of the grouting difficulties excused the failure

---

[5]     The procurement code "applies to every expenditure of state money by the state, acting through an agency, under a contract," other than specific exceptions which do not apply here.  AS 36.30.850(b).

[6]     *See* AS 36.30.630(b) ("Except [in arbitration cases under] AS 36.30.627(a)(1), within 15 days after receipt of an appeal on a contract claim, the commissioner . . . may adopt the decision of the procurement officer as the final decision without a hearing.").

to comply with the contract's dispute provisions.

Osborne appealed the Commissioner's decision to the superior court. The superior court reversed the Commissioner's decision. The court agreed with Osborne "that in certain circumstances contractual or statutory formal notice requirements are excused or satisfied by actual notice." Concluding that DOT had actual notice of both the differing site condition and the local unavailability of material, and was not prejudiced by the lack of formal notice, the court determined that the "contractual and statutory notice requirements were satisfied." Because it decided that actual notice satisfied both the contract and the procurement code's notice requirements the court did not address the untimeliness of Osborne's claim. The court remanded the matter to DOT and ordered that it hold an evidentiary hearing before an administrative law judge to determine the merits of Osborne's claims and for a final decision by the Commissioner in accordance with AS 36.30.675(a).

DOT petitioned for our review of the superior court's decision. We granted the petition.

## III.  STANDARD OF REVIEW

"When the superior court is acting as an intermediate court of appeal in an administrative matter, we independently review the merits of the agency or administrative board's decision."[7]  A different standard of review is applied when reviewing agency decisions depending on the subject of review.[8]  "We apply the substitution of judgment standard to questions of law where no agency expertise is involved" and may "substitute [our] own judgment for that of the agency even if the

---

[7]     *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 298 (Alaska 2014) (quoting *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 630 (Alaska 2011)).

[8]     *Id.* at 299.

agency's decision had a reasonable basis in law."[9]

## IV.    DISCUSSION

The DOT Commissioner adopted the contracting officer's determination that Osborne's claim was filed outside the allowable period established in its contract and denied the claim on that basis. Questions of contractual interpretation are questions of law that do not involve agency expertise.[10] We therefore review whether the Commissioner correctly interpreted the contract using our independent judgment.

### A.    The Contract

The 88-page contract between DOT and Osborne outlines the general conditions of the agreement and the parties' responsibilities. It also specifies the procedures for changing the contract and for requesting more funding or time to complete a project, among other topics.

Article 15 of the contract outlines the process of filing a claim for additional compensation. Article 15.1.1 states that "[t]he CONTRACTOR shall notify the DEPARTMENT in writing as soon as the CONTRACTOR becomes aware of any act or occurrence which may form the basis of a claim." If the contractor and DOT do not agree how to address the act or occurrence, Article 15.1.3 describes the next step. "If the matter is not resolved by agreement within 7 days, the CONTRACTOR shall submit an Intent to Claim, in writing, to the DEPARTMENT within the next 14 days." Article 15.1.4 directs the contractor to keep "complete, accurate, and specific daily records concerning every detail of the potential claim including actual costs incurred" if it

---

[9]    *Id.* (first citing *Marathon Oil Co. v. State, Dep't of Natural Res.*, 254 P.3d 1078, 1082 (Alaska 2011); then citing *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987) (alteration in original).

[10]    *State, Dep't of Nat. Res. v. Alaskan Crude Corp.*, 441 P.3d 393, 398 (Alaska 2018).

believes additional compensation is warranted.

Following submission of a written Intent to Claim within 14 days after failing to reach an agreement with respect to the written notification, the contract sets a deadline for the contractor to file its claim with the designated contracting officer. Article 15.1.5 states that "[i]f the claim or dispute has not been resolved by the DEPARTMENT, then the CONTRACTOR shall submit a written Claim to the Contracting Officer within 90 days after the CONTRACTOR becomes aware of the basis of the claim or should have known the basis of the claim, whichever is earlier."

Another section of the contract, Article 15.2.1, specifies the information that the written Claim[11] required by Article 15.1.5 must contain:

 a. The act, event, or condition the claim is based on[;]

 b. The Contract provisions which apply to the claim and provide relief[;]

 c. The item or items of Contract work affected and how they are affected[;]

 d. The specific relief requested, including Contract Time if applicable, and the basis upon which it was calculated[; and]

 e. A statement certifying that the claim is made in good faith, that the supporting cost and pricing data are accurate and complete to the best of [the CONTRACTOR'S] knowledge and belief, and that the amount requested accurately reflects the Contract adjustment which the CONTRACTOR believes is due.

Article 15.1.6 makes clear that its terms are binding, warning that a "CONTRACTOR waives any right to claim if the DEPARTMENT was not notified

---

[11] We use "Claim" to refer to the written and certified claim required by Article 15.1.5.

properly or afforded the opportunity to inspect conditions or monitor actual costs or if the Claim is not filed on the date required."

## B. The Parties' Positions

While both Osborne and DOT acknowledge that a claim must be filed within the 90-day period specified by Article 15.1.5, they disagree about when the 90-day window begins. DOT argues that the plain language of the contract establishes that the 90-day limitation begins when the contractor becomes aware of the underlying condition that forms the basis of the claim that the contractor is entitled to an increase in the contract price. According to DOT, unless a written and certified Claim is filed within 90 days of the contractor becoming aware of the basis of a claim for additional compensation, the claim is waived.

Osborne, on the other hand, argues that the 90-day limitation period for filing a written and certified Claim begins only after an initial claim is denied. It disputes the Commissioner's conclusion that the contractor's deadlines to give notice of a claim under Article 15.1.1 and to file a certified Claim under Article 15.1.5 both begin when the contractor becomes "aware of any act or occurrence which may form the basis of a claim." Osborne essentially argues that the phrase "basis of a claim" is defined differently in these two provisions of the contract.

Osborne asserts DOT incorrectly calls a "claim" under Article 15.1.1 what is actually a request for a change in the contract price pursuant to Article 9. Article 9 authorizes DOT to unilaterally change the contract under certain circumstances. Article 9.9 is entitled "Differing Site Conditions"; Article 9.9.1 requires that a contractor "promptly, and before such conditions are disturbed," notify the contracting officer in writing if it encounters "subsurface or latent physical conditions at the site differing materially from those indicated in the Contract, and which could not have been discovered by a careful examination of the site, or . . . unknown physical conditions at

-11-                                                    **7447**

the site, of an unusual nature, differing materially from those ordinarily encountered." After receiving such written notice, the contracting officer must then "promptly investigate" and modify the contract if the differing conditions require. Article 9.9.2 mandates that "[a]ny claim for additional compensation by the CONTRACTOR under this clause shall be made in accordance with Article 15." Osborne contends that Article 9.9.1 requires DOT to modify the contract when conditions have changed, and, accordingly, the "basis of a claim" arises only after DOT has denied the contract's remedy by refusing a change request.

Osborne argues that DOT's failure to modify the contractual price or time requirements after a change in the work would amount to a breach of the contract because it would not comply with the conflict resolution procedures the parties agreed to. Such a breach of contract becomes the "basis of a claim" that starts the clock for filing a certified Claim under Article 15.1.5. Osborne therefore argues that the 90-day deadline to file its claim for additional compensation had not expired when the certified Claim was submitted in 2016 — and has not yet begun to run — because DOT "never responded to Osborne's February 5, 2015 pass-through of AVAR's claim."

Further, Osborne argues that its interpretation is correct because interpreting Article 15.1.5 in line with DOT's characterization would contradict provisions in Article 13, which concerns payments made to a contractor.[12] Osborne urges us to adopt the reasoning of *Millgard Corp. v. McKee/Mays*,[13] a Fifth Circuit case, to conclude that the date of accrual for a construction claim should be the date of denial of a change request.

---

[12] Article 13 is entitled "Payments To Contractor And Completion" and concerns payment procedures, including the waiver of claims by the contractor once final payment has been made and accepted.

[13] 831 F.2d 88 (5th Cir. 1987).

## C.   Interpretation of the Contract

When interpreting contracts, we start with the language of the contract itself.[14] We then look to "relevant extrinsic evidence" and "case law interpreting similar provisions."[15] The goal is to "give effect to the reasonable expectations of the parties."[16] When interpreting a term, we consider both "the provision and agreement as a whole,"[17] and give "words their 'ordinary, contemporary, common meaning' unless they are 'otherwise defined.' "[18]

Starting with the text of the contract, Article 15 outlines three steps to the claims process. Article 15.1.1 requires the contractor to provide written notice when it becomes aware of the basis of a claim for additional compensation. Next, Article 15.1.3 provides that if the matter is not resolved by agreement within 7 days, the contractor must submit an Intent to Claim, in writing, to DOT within the next 14 days. Finally, if the "claim or dispute" is not resolved by the department, Article 15.1.5 requires the contractor to submit a "Claim" to the contracting officer within 90 days of when the contractor became aware, or should have become aware, of the basis of the "claim."

---

[14]    *See Flint Hills Res. Alaska, LLC v. Williams Alaska Petroleum, Inc.*, 377 P.3d 959, 975 (Alaska 2016).

[15]    *Graham v. Municipality of Anchorage*, 446 P.3d 349, 352 (Alaska 2019) (quoting *Flint Hills Res. Alaska, LLC*, 377 P.3d at 975).

[16]    *Id.* (quoting *Stepanov v. Homer Elec. Ass'n.*, 814 P.2d 731, 734 (Alaska 1991)).

[17]    *Id.* (quoting *Flint Hills Res. Alaska, LLC*, 377 P.3d at 975).

[18]    *SMJ Gen. Constr., Inc. v. Jet Commercial Constr., LLC*, 440 P.3d 210, 215 (Alaska 2019) (quoting *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1001 n.3 (Alaska 2004)).

Osborne's proposed reading of the contract terms contradicts the contract's plain text. Its interpretation fails to consider how the phrase "basis of a claim" is used throughout the contract. Article 15.1.1 defines the "basis of a claim" as "any act or occurrence" that could result in a request for "additional compensation or an extension of [time]." Yet Osborne argues that the phrase has a different meaning in Article 15.1.5, referring there to a "breach of the contract" resulting from the denial of a change request.

Osborne's reading would require us to interpret the phrase "basis of [a] claim" differently depending on where in the contract it appears. But "interpretation of a contract term does not take place in a vacuum," requiring instead "consideration of the provision and agreement as a whole."[19] Because "[w]e seek to interpret contractual terms harmoniously, 'avoiding those interpretations that cause conflicts among the provisions,' " the same language cannot have different meanings in Article 15.1.1 and 15.1.5.[20]

Having determined that the "basis of a claim" is defined consistently throughout the contract, we next turn to Osborne's contention that the contract requires DOT to notify Osborne its informal claim has been denied before the 90-day limitation period for filing a Claim begins.

We first note that contrary to Osborne's argument, the contract does not require DOT to notify the contractor if it does not "resolve" a claim. Article 15.1.3 simply mandates that if the matter (that is, the claim) "is not resolved by agreement within 7 days the CONTRACTOR shall submit an Intent to Claim, in writing, . . . within the next 14 days." DOT is not obligated to respond to a claim that is not certified

---

[19]     *Graham*, 446 P.3d at 352 (quoting *Flint Hills Res. Alaska, LLC*, 377 P.3d at 975).

[20]     *See O'Connell v. Will*, 263 P.3d 41, 45 (Alaska 2011) (quoting *Rockstad v. Global Fin. & Inv. Co.*, 41 P.3d 583, 586-87 (Alaska 2002)).

according to Article 15.2.1. And although a contracting officer is required to "promptly investigate" once notified of differing site conditions, there is no contractual requirement that the officer respond or modify the contract if investigation reveals that conditions do not differ. Because the contract does not require DOT to notify the contractor if DOT disputes or denies the basis of the contractor's claim, Osborne's argument that the 90-day period does not start until after DOT notifies the contractor of DOT's dispute or denial fails.

Additionally, Article 15.1.5, which establishes the 90-day time limit for submitting a Claim, contains no reference to Article 15.1.3's informal process for resolving a contractor's notice of a basis of a claim. Instead it simply states that the contractor must submit a written Claim to the contracting officer "within 90 days after the CONTRACTOR becomes aware of the basis of the claim, or should have known the basis of the claim." Because the 90-day window begins when a contractor knows, or should know, of the existence of a basis for a claim, the contractor's knowledge, not any action taken by DOT, determines when the 90 days begin to run.

Osborne's argument that DOT's interpretation of Article 15 is inconsistent with Article 13 is also unconvincing. Article 13.17 states that "[t]he making and acceptance of final payment will constitute a waiver of all claims by the CONTRACTOR against the DEPARTMENT other than those previously made in writing and still unsettled." Osborne reads this provision to mean that all written claims are preserved until DOT settles them. It asserts that DOT's reading of Article 15 cannot be correct because it would result in the waiver of any unsettled written claim unless the claim was a timely submitted "certified 'written Claim,'" which would create a contradiction within the contract.

But Osborne is mistaken. Article 13.17 concerns only a contractor's waiver of a claim. It provides that if a claim was filed in writing with DOT under Article 15,

that claim would be preserved in the event that a contractor accepts final payment under the contract. But if it had not been filed in writing, the claim would be waived by the contractor's acceptance of the final payment. Article 13.17 has no effect on the 90-day deadline for filing a Claim. It provides only that unsettled claims previously submitted in writing are not waived by accepting final payment on all resolved claims under the contract; it does not preserve claims indefinitely.

*Millgard Corp. v. McKee/Mays*, the Fifth Circuit case Osborne cites, does not persuade us otherwise.[21] After Millgard's claim for additional compensation due to allegedly differing site conditions was denied, it sued for breach of contract four years after the project's date of completion.[22] McKee contended that the four-year Texas statute of limitations for contract claims barred the action, but the Fifth Circuit disagreed.[23] The Fifth Circuit instead held that although under Texas law the right to recover traditionally accrues at the time performance is completed, it had accrued when McKee denied Millgard's claim for a change in compensation six months after the work was performed.[24] Because the contract provided for dispute resolution procedures that continued past the date of completion, Millgard's right to sue accrued only after that contractual remedy failed.[25] And because Millgard sued within four years of the denial, the action was filed within the limitations period.[26]

---

[21] *See* 831 F.2d 88, 89-90 (5th Cir. 1987).

[22] *Id.* at 90.

[23] *Id.* at 90-91.

[24] *Id.*

[25] *Id.* at 91.

[26] *Id.*

*Millgard* is distinguishable on three grounds. First, unlike this case, *Millgard* concerns a breach of contract claim rather than a dispute over the administrative claims process contained in the contract.[27] Second, a crucial consideration in the Fifth Circuit's decision was Millgard's full participation in the contractual claims process — Millgard provided formal written notice, kept records, and engaged thoroughly with McKee.[28] Here Osborne failed to comply with the procedures specified in the contract. And third, the contract in *Millgard* did not contain a specific period of limitation, while the contract here did.[29] Unlike in *Millgard*, where the contractor met all of its contractual requirements, Osborne did not;[30] instead Osborne invites us to interpret the contract in a way that would excuse its failure to comply. We decline the invitation.

Osborne's contract with DOT required it to file a written Claim for additional compensation no later than 90 days after it became aware of the basis of a potential claim, and to begin to keep accurate records of the additional costs for which it was seeking payment. Osborne knew or should have known that it had a potential claim when the grouting was completed on October 10, 2014. The deadline for Osborne to file its Claim was therefore January 8, 2015. Alternatively, if, as the contracting officer discussed, Osborne did not know of the basis for its claim until it received AVAR's letter on February 5, 2015, its deadline for filing would have been May 6, 2015. But determining the actual deadline is unnecessary, because even using the "last possible date which [Osborne] could argue it became aware of the basis of the claim" — when the project was substantially completed on March 24, 2015 — Osborne was required to have

---

[27] *Id.* at 90.

[28] *Id.* at 89-91.

[29] *Id.* at 89-90.

[30] *Id.*

filed its Claim by June 22, 2015.

Osborne did not file its Claim until May 11, 2016. As the contracting officer wrote, "Osborne at best was just under a year late and at worst over a year and four months late in filing its claim." Article 15.1.6 clearly states that "the CONTRACTOR waives any right to [a] claim" if it fails to file its Claim within the 90-day period set by Article 15.1.5. Because Osborne failed to file its Claim within the time period required by its contract, Osborne waived any right to additional compensation.[31]

## V.    CONCLUSION

The DOT Commissioner correctly interpreted Osborne's contractual obligations when it adopted the contracting officer's decision denying the claim. We therefore REVERSE the superior court's order and REINSTATE the Commissioner's decision barring Osborne's claim as untimely.

---

[31]    Because the terms of the contract clearly support the Commissioner's decision and bar Osborne's claim, we do not reach the issues of whether the statute also barred the claim or whether DOT's actual notice required that it accept Osborne's claim. We note, however, that the contractual language tracks that of the procurement code nearly verbatim.